[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 13, 2005
THOMAS K. KAHN
CLERK

No. 03-13611

D. C. Docket No. 00-00239-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN MIGUEL GONZALEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 13, 2005)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and RESTANI*,
Judge.

PER CURIAM:

---

*Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by
designation.

Defendant, Juan Miguel Gonzalez, appeals his convictions and sentences for possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), and conspiracy to import cocaine, 21 U.S.C. § 963. We affirm his conviction for conspiracy to import cocaine. But we reverse his conviction for possession with intent to distribute cocaine and remand for a new trial.

BACKGROUND

Gonzalez was indicted (1) with Juan "Tito" Gonzalez[1] and Oscar Gomez for possession with intent to distribute cocaine in October and November 1998, and (2) with Tito for conspiracy to import cocaine into the United States in March 1999.[2] The government's theory of the case was that Gonzalez imported cocaine from Ecuador and sold it to Miami customers, including Luis Perez; Perez then sold it to his own customers, including Gomez and Enrique Bover. The government's case in large part depended on the testimony of Perez. Gonzalez's defense theory was that Perez implicated Gonzalez to protect the cocaine's alleged

_____

[1] Gonzalez is unrelated to Tito Gonzalez. We refer to Defendant as "Gonzalez" and to Tito by his first name.

[2] Gonzalez was convicted on the above-mentioned counts but acquitted of one count of conspiracy to possess with intent to distribute cocaine. Tito and Oscar Gomez were acquitted of all counts.

true supplier: Jorge Luis Vasquez. To substantiate this theory, Gonzalez attempted to establish that Perez had a motive to protect Vasquez, that Vasquez previously had supplied cocaine to Perez, and that Vasquez had arranged for the importation of containers from Ecuador into South Florida while communicating with Perez.

### A. The October/November 1998 cocaine deals

Perez testified that he began to sell cocaine in the early 1990s and that he met Gonzalez about 1996 through Tito. Perez stated that he purchased three multi-kilogram quantities of cocaine from Gonzalez in September, October, and November 1998; Tito acted as an intermediary. Perez then sold the cocaine to Bover and Gomez. Perez did not discuss his customers with Gonzalez or Tito. According to Perez, Gonzalez and Tito told him that Gonzalez got his cocaine from Colombian suppliers and that the cocaine was to arrive by ship in containers.

Perez testified that he picked up the cocaine from Gonzalez's garage on the first two occasions and from Tito's garage on the third occasion. Perez then delivered it to his customers, including Bover and Bover's brother-in-law, Orlando

3

Garcia.  Bover did not pay Perez fully for the October shipment and owed

$51,000.  Garcia and Bover were arrested in November 1998.

DEA agents searched Garcia's house and found empty cocaine wrappers

with the handwritten marking "357" on them.[3]  Garcia testified that Perez was the

only source of cocaine for him and Bover during late 1998.  Perez was arrested in

January 1999.

During cross-examination of Perez, the defense attempted to prove that

Perez was trying to protect Vasquez, the true supplier of the cocaine. The defense

tried to show that (1) Vasquez was the "compadre," or godfather, to Perez's son

and maintained a close relationship with Perez, (2) Vasquez communicated often

with Perez during October and November 1998, and (3) Perez bought thousands of

dollars of furniture for Vasquez during that time.

Perez denied that he, while incarcerated, had told two inmates that Vasquez

was the true cocaine supplier.  The defense then presented the testimony of two

convicted felons, Fernando Garcia and Fabian Fabian, who were incarcerated with

Perez.  These persons testified that Perez indicated that Vasquez, Perez's

---

[3] This number had no dots or decimal points. A DEA agent testified that in his experience many kilogram cocaine packages are marked to identify the source of supply or the recipient.  This agent also acknowledged that a kilogram of cocaine is 35.7 ounces, but that wholesale cocaine usually is packaged according to the metric system.

"compadre," was the true supplier of the cocaine in 1998, and that Perez was afraid to implicate Vasquez. Garcia testified that Vasquez had a connection at the Port of Miami and Port Everglades to "pull out" containers.

On redirect examination, Perez testified that he had not trafficked in drugs with Vasquez. During its case, the defense sought to have Bover testify that Vasquez had in fact supplied cocaine to Perez in 1994 and 1995. The district court excluded this testimony as "collateral" because (1) Bover could not testify that Vasquez was Perez's source for the cocaine charged in the present case and (2) impeachment of Perez could not be proved by extrinsic evidence.

The defense also sought to introduce freight invoices that would have established that Vasquez had arranged for several importations of containers of produce from Ecuador to South Florida in late 1997. The defense then attempted to introduce records of Vasquez's cell phone records from this time, showing that Vasquez was calling Perez and persons in Ecuador, Colombia, and Venezuela around the same dates he was calling to arrange for the importation of containers from Ecuador. The district court excluded this evidence as not relevant because the defense did "not have evidence for [Vasquez's] telephone transactions in 1998."

5

B.    The March 1999 cocaine importation

On 12 March 1999, a Port Everglades U.S. Customs officer searched a cargo ship and found a 40-foot container ("container #378-6") that had broken in half, spilling pallets of floor tiles and packages containing 1,500 pounds of cocaine. The cocaine packages had been concealed under a false bottom and bore the same handwritten marking, "357", as the wrappers seized from Orlando Garcia's garage. The container was consigned to Yalorde Tile Company, a Miami business owned by Gonzalez.[4]

In February 1999, Yalorde Tile had ordered several containers of tile from an Ecuadorian tile company. Yalorde's representative in Ecuador hired a person to pick up two of these containers, load them with tile, and return them to the port. On 17 February, this person picked up the containers and returned to port on 19 February; the containers left Ecuador on 25 February. The government's theory was that Yalorde's agents in Ecuador switched the original container #378-6 after

_____

[4] An investigation showed that a container bearing the same number as the one seized in Port Everglades left Miami for Ecuador on 10 January 1999 filled with toiletries and arrived in Ecuador about 19 January 1999. The full container stayed in the port until 2 February, when it left the port and returned empty on 3 February. An inspection company employee testified that the container that left for Ecuador in January 1999 was different from the one that returned to Florida in March 1999, even though they bore the same container number and container numbers are not duplicated.

picking it up on 17 February and replaced it with a false-bottomed container bearing the same number.

## DISCUSSION

Gonzalez argues that the district court violated the Federal Rules of Evidence by excluding several items of evidence crucial to his defense theory. First, he argues that the district court should have admitted Bover's testimony that Vasquez supplied cocaine to Perez beginning in 1994-95 (1) as substantive evidence of a narcotics relationship between Perez and Vasquez, which would support the theory that Perez was protecting Vasquez, the true supplier of the cocaine in late 1998, and (2) to rebut Perez's statement that he had not trafficked drugs with Vasquez. Second, Gonzalez points to the excluded freight invoices showing Vasquez's importation of several containers of produce from Ecuador in late 1997 and records of Vasquez's cell phone calls at this time. Gonzalez claims this evidence would have shown that Vasquez had the experience and knowledge to import cocaine from Ecuador disguised in containers.[5]

---

[5] We reject Gonzalez's other evidentiary arguments. He challenges the district court's exclusion of Perez's tape-recorded statements to Bover that Colombians were the "owners" of the cocaine as evidence of Gonzalez's alleged prior inconsistent statement that Gonzalez, a Cuban, was the owner

We review the district court's evidentiary rulings for abuse of discretion. United States v. Miles, 290 F.3d 1341, 1351 (11th Cir. 2002). A district court abuses its discretion "if it misapplies the law or makes findings of fact that are clearly erroneous." United States v. Frazier, 387 F.3d 1244, 1276 (11th Cir. 2004) (citation omitted), cert. denied, 125 S.Ct. 2516 (2005). A district court may not exclude "crucial relevant evidence necessary to establish a valid defense." United States v. Baptista-Rodriguez, 17 F.3d 1354, 1364 (11th Cir. 1994) (citation omitted).

To challenge successfully a verdict on the basis of a district court's incorrect evidentiary ruling, Gonzalez must: (1) "demonstrate either that his claim was adequately preserved or that the ruling constituted plain error"; (2) "establish that the district court abused its discretion in interpreting or applying an evidentiary

---

of the cocaine. But the record supports the district court's factual determination that Perez eventually admitted at trial that the Colombians were the owners of the cocaine. According to Perez, Gonzalez served as the middle man between the Colombians, who ultimately "owned" the drugs, and Perez. Thus, Perez made no "prior inconsistent statement" in this matter; no basis existed for admitting the extrinsic taped evidence under Fed.R.Evid. 613(b).

Gonzalez also challenges the exclusion of the report of an Ecuadorian police officer, which allegedly would have shown that container #378-6 may have had excess weight prior to coming under the control of Gonzalez's agents in Ecuador. Although the excluded statement in the police report is contained in a section of the report labeled "Conclusions," it appears that the "conclusion" was nothing more than a reiteration of a report and statement of another person. The report expresses no finding; it just transcribes what a third party said. We cannot say that the district court abused its discretion in classifying this evidence as hearsay and not as "factual findings resulting from an investigation" admissible under Fed.R.Evid. 803(8)(C).

8

rule"; and (3) establish that the error affected a substantial right. United States v. Stephens, 365 F.3d 967, 974 (11th Cir. 2004).

Our recent decision in Stephens helps guide us in this case. The mostly undisputed facts in that case showed that a friend of Stephens, Robinson, was arrested for selling methamphetamine to a confidential informant with the Georgia Bureau of Investigation ("GBI"). Robinson then agreed to cooperate with the GBI by organizing a series of meetings with Stephens to purchase methamphetamine. On eight separate occasions, Robinson met with Stephens, and after each meeting, Robinson returned to the GBI with quantities of methamphetamine. These meetings were videotaped and audiotaped, but the contents of the tapes did not show a drug transaction. Stephens, 365 F.3d at 970-72.

At Stephens's trial, the defense proffered the testimony of three witnesses who would testify that Robinson still was selling methamphetamine, even while cooperating with the GBI. The district court excluded the testimony: it determined that whether Robinson had drugs from a source other than Stephens, or whether Stephens was a drug dealer on occasions other than those at issue in the indictment, was "not relevant to this trial." Id. at 972-73. The court described the defense as just "trying to show that Mr. Robinson was a drug dealer or dealing in

9

drugs at other times," and not attempting to establish an independent defense.  Id. at 973.

We concluded that the district court abused its discretion because the proffered evidence was admissible under Fed.R.Evid. 404(a) and (b).  The excluded evidence was directly material to Stephens's defense theory that Robinson had a motive for setting up Stephens: to escape a lengthy jail sentence for Robinson.  Stephens, 365 F.3d at 974-76.

And we determined that the exclusion of this evidence affected Stephens's substantial rights: "the excluded witness testimony could have substantially influenced the jury's deliberations," given several "disturbing flaws" in the government's remaining evidence.  Stephens, 365 F.3d at 977-78.  Among other things, we pointed to these things: (1) the absence of corroborating evidence independent of Robinson; (2) the lack of physical evidence tying Stephens to Robinson's drugs; and (3) the claims of Robinson being the "only actual link" between Stephens and Robinson's drugs.  Id. at 977-79.

We determined that the district court's reason for excluding the evidence -- it "was not relevant because it didn't demonstrate that Robinson actually had drugs from outside sources on the specific dates when he allegedly engaged in drug transactions with Stephens" -- established too high of a threshold for the

introduction of potentially exculpatory evidence that bolstered the defense theory.
Id. at 980.

Turning to the present case, we first conclude that Gonzalez adequately preserved these claims.[6]  And we conclude that the district court abused its discretion in excluding (1) testimony about a prior drug trafficking relationship between Perez and Vasquez, and (2) evidence suggesting Vasquez may have had the knowledge and capacity to import containers with concealed drugs in a manner similar to Gonzalez's alleged cocaine importation scheme.

First, Bover's testimony was relevant and not excludable under Rule 608(b), which provides "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . , may not be proved by extrinsic evidence."  But such extrinsic evidence "should be admitted . . . where it is introduced to disprove a specific fact material to the defendant's case."  United States v. Calle, 822 F.2d 1016, 1021 (11th Cir. 1987).  In other

---

[6] The government contends that, because Gonzalez failed to raise it in the district court, we review for plain error his argument that Bover's testimony refuted Perez's disclaimer of a drug relationship with Vasquez.  Our review of the record shows that Gonzalez, at trial, did not frame the argument as clearly as he does on appeal.  But the district court and defense counsel did discuss the impeachment of Perez's testimony -- and the notion that Bover's testimony supported the defense theory that Vasquez and Perez had a drug relationship -- as grounds for admitting Bover's testimony.  This submission was sufficient to preserve the issue for appellate review.  See United States v. Quinn, 123 F.3d 1415, 1420 (11th Cir. 1997) (no formal offer of proof required to preserve objection to ruling excluding evidence where substance of evidence is apparent from context).

11

words, although extrinsic evidence of Perez's past drug dealings with Vasquez could not be used properly just to attack Perez's general credibility, "such evidence could be used to refute specifics to which [Perez] had previously testified." United States v. Cousins, 842 F.2d 1245, 1249 (11th Cir. 1988).

Taken together with the testimony Gonzalez elicited during Perez's cross-examination of the close, continuing relationship between Perez and Vasquez, Bover's testimony would have been relevant to disprove a specific fact material to Gonzalez's defense. On cross-examination, Perez testified that he did not have "shady business" with Vasquez; and on redirect examination, Perez testified that he had not trafficked drugs with Vasquez. This created the impression to the jury that Vasquez could not have been the supplier of the drugs in this case and that the relationship between Perez and Vasquez, although close, did not involve serious and dangerous illegal acts.[7] But Bover's testimony -- although also tending to impeach Perez's testimony -- would have also portrayed Perez as a person with an added, crucial incentive to protect Vasquez. Such a characterization of the Perez-Vasquez relationship would have supported an inference crucial to the defense theory: that Perez had a motive to protect Vasquez, a person with whom Perez had

---

[7] Perez testified that Vasquez would call him from time to time to "play the numbers," an apparent reference to gambling.

12

a prior drug trafficking relationship. See Calle, 822 F.3d at 1021 (stating that the self-interest of a witness is not a collateral issue). And evidence that Vasquez had supplied Perez with cocaine in 1994-95 was otherwise "relevant" under Fed.R.Evid. 401 -- it tends to show that it was more likely that Vasquez may have supplied the drugs to Perez in late 1998. See United States v. Tinoco, 304 F.3d 1088, 1120 (11th Cir. 2002) (stating that the standard for what constitutes relevant evidence is low), cert. denied, 123 S.Ct. 1484 (2003).

We also conclude that the evidence about Vasquez's use of containers to import produce from Ecuador in late 1997 and his telephone calls to Perez, Ecuador, Colombia, and Venezuela about this importation was relevant and admissible. The government contends that this conduct evidences purely legal acts and that a jury would have to "pile unreasonable inference upon unreasonable inference" to arrive at the conclusion that Vasquez was importing cocaine from Ecuador in containers. But even by itself, this evidence suggests that Vasquez had the means and knowledge to import containers from Ecuador to South Florida and that he had contacts at the same time with persons in Colombia and Venezuela, known cocaine "source countries." This evidence makes it at least slightly more probable that Vasquez had the means to engage in a cocaine importation scheme strikingly similar to the charged offenses. And when we view this evidence with

13

the felon testimony about Vasquez having connections to pull out cocaine-bearing containers and with the evidence that Vasquez was a previous drug trafficker, we have no difficulty in determining that the excluded evidence makes a factor favorable to the defense theory more probable: that Vasquez cannot be ruled out as the importer of the cocaine in this case.

The district court excluded (1) Bover's testimony because he could not testify that Vasquez was Perez's source for the cocaine charged in this case, and (2) the evidence of Vasquez's container importations because it was too remote in time to be relevant. In Stephens, we cautioned trial courts against establishing "too high of a threshold for the introduction of potentially exculpatory evidence." Stephens, 365 F.3d at 980. Bover's testimony and the excluded shipping evidence "does not establish with certainty" that Vasquez supplied the drugs in this case. Id. But the excluded evidence "bolsters the defense theory" that Perez, due to his drug trafficking activities and continuing relationship with Vasquez, may have had a motive to protect Vasquez. Id. And the excluded evidence tends to show that Vasquez had the means to import drugs in the manner charged in this case, which supports the defense theory that Vasquez was the true drug supplier in this case.

The government maintains that the excluded evidence was too remote in time to be relevant: Bover would have testified to conduct that occurred

14

approximately three to four years before the conduct charged in this case, and the evidence about Vasquez's shipping occurred approximately one year before the charged conduct. But courts generally should not prohibit a defendant from presenting a defense theory to the jury when some factual basis can support that theory. See United States v. Thompson, 25 F.3d 1558, 1564 (11th Cir. 1994). The excluded evidence here did provide some factual basis to support a crucial element of the defense theory. And we remember that we had, before this trial, allowed evidence of conduct that was even more temporally remote. See United States v. Calderon, 127 F.3d 1314, 1332 (11th Cir. 1997) (in the context of a Rule 404(a) ruling time span of conduct occurring six years before charged offense not too remote for proper consideration); United States v. Phelps, 733 F.2d 1464, 1472 (11th Cir. 1984) (five years). Of course, the inquiry is not "a mechanical application based solely on the amount of time that has elapsed between the prior extrinsic act and the present offense." United States v. Scott, 701 F.2d 1340, 1346 (11th Cir. 1983).

We also conclude that the exclusion of this evidence affected Gonzalez's substantial rights on his conviction for possession with intent to distribute cocaine. The evidence of Gonzalez's guilt was not overwhelming on that charge. See Calle, 822 F.2d at 1021. As in Stephens, the government's case lacked the

15

corroborating evidence commonly found in cases of extensive drug dealing. Stephens, 365 F.3d at 977. The only physical evidence tying Gonzalez to the cocaine in this case is that the cocaine wrappers found in Garcia's garage in November 1998 bore the same "357" marking as the cocaine found in March 1999 in container #378-6, which was consigned to Gonzalez's tile company. But Garcia, notably, did not testify that he knew that Gonzalez was the ultimate source of the cocaine.

And Perez was the government's chief witness: his testimony provided the only actual link between Gonzalez and the drugs. Had the jury disbelieved his testimony, little evidence existed on which to base a guilty verdict. Evidence about Perez's motive to protect Vasquez, as well as evidence suggesting that Vasquez could have had the experience and knowledge to import the cocaine in a manner similar to the charged conduct, could have been "quite probative to the jury." Stephens, 365 F.3d at 980. The evidence went to the heart of the defense and was material: without being able to show the possible drug trafficking aspect to the Perez-Vasquez relationship, Gonzalez's defense theory was much less plausible.

Considering the circumstances, we conclude that the exclusion of the testimony about the prior drug trafficking relationship between Perez and Vasquez

16

"was more likely than not a substantial factor" in Gonzalez's conviction for possessing cocaine with the intent to distribute the drug. Stephens, 365 F.3d at 980. This evidence could have played an important role in the jury's deliberations on this charge, and, therefore, affected Gonzalez's substantial rights.

But on the conspiracy-to-import charge, we cannot conclude that the exclusion of Vasquez's phone records and shipping records had the same kind of substantial influence on the jury.[8] Unlike the conviction for possession with intent to distribute, several other facts in evidence corroborated the government's theory. These undisputed facts include that the container filled with cocaine was consigned to Gonzalez's company, Yalorde Tile. In addition, Yalorde's representative in Ecuador hired one company to load some containers and another person to load others, even though the containers were being filled with products from the same company.[9] And the importation charge is not mostly dependent on Perez. Thus, Gonzalez's conviction on the importation charge is not like Stephens where corroborating evidence is "absent." 365 F.3d at 977. Nor is it like Calle

---

[8] The excluded Bover testimony on the Perez-Vasquez drug trafficking relationship is not particularly relevant to the facts about the March 1999 container importation; and the March 1999 container importation is the basis for the conspiracy to import charge.

[9] In a vacuum, this business practice does not mean much. But, when coupled with the government's discovery of 1500 pounds of cocaine on one of the separated containers, it could support a jury's finding of guilt.

where the government presented "no other evidence upon which [the jury] could have based a guilty verdict." 822 F.2d at 1021. In the light of these conclusions, we are not "left in grave doubt" that "the error itself had substantial influence" on the jury's verdict. Stephens, 365 F.3d at 977.

CONCLUSION

In the light of Stephens, we vacate Gonzalez's conviction under 21 U.S.C. § 841(a)(1), and remand for a new trial on that count. We affirm Gonzalez's conviction under 21 U.S.C. § 963. Gonzalez's sentence is vacated to be determined on remand.

AFFIRMED IN PART, VACATED IN PART AND REMANDED.